Decided July 5, 1989

SUPERIOR COURT
OF THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

IN RE THE ESTATE OF              )      CIVIL ACTION NO. 88-70(1)
                                 )
LORENZO IGITOL,                  )      MEMORANDUM OPINION AND ORDER
                                 )
                 Deceased.       )
                                 )

## I.   PROCEDURAL BACKGROUND

On February 8, 1989 this Court issued a Decision denying Petitioner Victorino N. Igitol's petition to partition the estate of Lorenzo Nemaisei Igitol, comprised of 4.505 hectares of land known as Lot No. 016 B 13, situated at Sadog Dogas, Saipan, Northern Mariana Islands.   On February 21, 1989, the Petitioner filed a motion asking the Court to reconsider its February 8th Decision.

On May 4, 1989, the parties agreed to the setting of a date for an evidentiary hearing on the Petitioner's motion for reconsideration.

The evidentiary hearing was eventually held on June 13, 1989. Present at the hearing were Petitioner and his counsel, Mr. Charles K. Novo-Gradac; Pablo N. Igitol and his attorney, Mr. David A. Wiseman; and Ursula L. Aldan and her attorney, Mr. Rexford C. Kosack.  At the conclusion of the hearing, the Court took the matter

907

under advisement. All the parties were urged to submit written arguments and points and authorities in support of their respective positions.

## II. ISSUES PRESENTED

The issues before the Court are really three-fold, to wit:

1. Whether the Igitol family land is subject to the traditional Carolinian custom of land use and ownership.

2. If so, whether the history of the land and the activities of the heirs in relation to the land are consistent with the traditional Carolinian custom.

3. Whether the application of the traditional Carolinian custom violates the Equal Protection clause under §6, Article I of the CNMI Constitution.

## III. DISCUSSION

### A. The Traditional Carolinian Land Tenure Pattern

The first, and perhaps most scholarly, recordation of the traditional Carolinian land tenure pattern in the Northern Mariana Islands was done by anthropologist Alexander Spoehr in 1954. It has been written that under the "traditional" Carolinian custom:

> "... farmland, sitio, and buildings upon either were "owned" by the women members of a maternal lineage. If a man built a house, it automatically became his wife's. On his death, or in case of divorce, the house was retained by his wife. Further, the land of the lineage was not divided on the death of members of the lineage but was retained for individual use of lineage members, who might build separate houses upon it and cultivate

908

different parts of it but who did not split ownership of
land holdings among themselves.  The vehicle for the
ownership and control of land was therefore corporate
group." 1/

As the Northern Mariana Islands endured the Spanish, German,
Japanese and American occupations, the "traditional" Carolinian
custom underwent changes.

> "... Contact of the Carolinians with Europeans,
> Japanese, and American administrations as well as with
> the Chamorros has not left Carolinian concepts of land
> tenure and inheritance untouched.  A number of factors
> have been introduced which have resulted in changes in
> the traditional Carolinian pattern.  The homesteading
> program introduced in German times resulted in title
> to some land being given to Carolinian men.  Inheritance
> of such lands necessarily followed a modified pattern.
> In some cases the man passed this land on to his
> daughters who subsequently founded a new matrilineal
> lineage whose lands were those passed onto the founders
> by the father.  One case was noted by Spoehr in which
> a Carolinian man who had title to his land passed it
> on in equal shares to his two children - a daughter
> and a son.  They kept the land undivided, and though
> the daughter has died, the children of both of them
> work the land.  Other cases have been noted in which
> a title-holding Carolinian father has given his land
> to a single male or female child.  In most cases the
> child considered the land as his or her personal
> property to dispose of as he wished.  In some of the
> exceptions to the traditional pattern illustrated
> above, Carolinian Land tenure and inheritance
> practices seem to be approaching Chamorro custom. 2/

The Spanish, German, Japanese, and the American administrations
did not record, preserve or enforce the traditional Carolinian

---

1/  Alexander Spoehr, _Fieldiana:  Anthropology_, Vol. 41;
    _Saipan, The Ethnology of a War Devastated Island_ (1954)
    at p. 363 (hereinafter "Spoehr").

2/  See Parts IV, "Land Tenure in the Marianas", _Land Tenure
    Patterns in the Trust Territory of the Pacific Islands_,
    (1958) Vol. 1.  See also, _Nekai v Nekai_, 4 TTR 388
    (Trial Div. 1969).

909

customs. As a consequence, this Court must establish certain guideline in an attempt to preserve Carolinian custom in the Northern Mariana Islands. This involves an examination of the history of the land and the activities of the heirs in relation to the land. If, on the one hand, the history of the land and the activities of the heirs in relation to the land are "consistent" with the traditional Carolinian notion of land use and ownership, then custom will be applied. If not, the Court will order equitable partition of the land. 3/

## B. The Igitol Family Land

he first issue that must be resolved is whether the Igitol Family land is subject to traditional Carolinian custom. The evidence reveals that the land apparently came from the German Government. (See Petitioner's Exhibit #3). It has been said that land tenure and inheritance obtained during the German Administration through the "homestead program" did not necessarily follow the traditional pattern of lineage or family land. (See Spoehr at pp. 365-366). As such, Petitioner contends that the heirs are really holding the land in question as tenants-in-common. Therefore, the common law doctrine from other jurisdictions should be applied rather than the traditional Carolinian custom. The Court disagrees. In addressing customs of the Carolinians (or for that matter, the Chamorros), the proper inquiries should be: (1) Is custom repugnant to the general principles of humanity?

---

3/ Tarope v Igisair, et al., (1987), CTC Civil Action No. 86-668.

910

and, (2) If not, do the history of the land and activities of the heirs in relation to the land consistent with custom? Clearly, traditional Carolinian notion of land use and ownership is not repugnant to the general principles of humanity. This Court has recognized it and will apply custom if the facts of a case requires application. 4/

This brings us to the second issue --- the history of the Igitol Family land and the activities of the heirs in relation thereto.

Before Decedent died in 1943, the evidence shows that he leased parts of the land and sold portions thereof. (See Petitioner's Exhibits 4, 5, and 10). After his death he was survived by: (1) Pablo Nemaisei Igitol, age 75, (oldest son), (2) Maria Igitol Taitano, age 73, (oldest daughter - died subsequent to the commencement of this proceeding), (3) Luis Nemaisei Igitol, Deceased, (second oldest son), and (4) Estefania Igitol Lifoifoi, age 63, (second oldest daughter). When the Certificate of Title to the land was issued on January 7, 1978, Pablo N. Igitol, the oldest male, became the Trustee of the land and not Maria, the oldest female in the family. (See Defendant's Exhibit "A"). The Trustee then designated which part of the land each heir should occupy. This designation was going to be formalized by the Trustee by proposing to divide the land. (See Plaintiff's Exhibit #1). The proposed partition did not go through apparently because the

_____

4  Estate of Refugia, 1 CR 219 (1981); Palacios v Coleman, 1 CR 34 (1980); Estate of Camacho, 1 CR 395 (1983).

Trustee was going to receive 15,541 square meters whereas the other three remaining heirs were going to receive only 9,837 square meters. When Petitioner planted crops on the land, the plants were uprooted. When he asked to build a structure on the land, the Trustee refused.

The land was also mortgaged twice by certain heirs. (See Petitioner's Exhibits 8 and 9). By mortgaging the land, individual heirs transferred a security interest on the land to the mortgagor. If the terms of the mortgage is not met, foreclosure and division of land will undoubtedly follow.

It is therefore evident that the Igitol family land has been dealt with by the Decedent, the Trustee and some of the heirs, contrary to the traditional Carolinian notion of land use and ownership. By their own acts, they have taken Lot No. 016 B 13 out of the traditional mold.

## IV.  CONCLUSION

For the foregoing reasons, it is the unalterable conclusion of this Court that even though the Igitol family land was originally governed by the traditional Carolinian custom, the history of the land and the activities of the heirs in relation thereto has been so inconsistent with custom that it would be unfair, unjust and inequitable to deny Petitioner's petition to partition the land.5/It is therefore:

---

5/  Since the Court has decided that the land will be partitioned, it is not necessary to address Petitioner's equal protection argument.

912

ORDERED, **ADJUDGED** and DECREED as follows:

1. The Court's Decision dated February 8, 1989 denying Petitioner's petition to partition the land shall and is hereby set aside.

2. The estate of Lorenzo Nemaisei Igitol, comprised of 4.505 hectares of land known as Lot No. 016 B 13, situated at Sadog Dogas, Saipan, Northern Mariana Islands, shall be divided equally among the four heirs. The Court urges the family to meet for the purpose of discussing and agreeing as to how the partition or division of the estate can best be accomplished. Despite the significant differences of opinion that obviously exists among the family members as to how the estate is to be divided, an amicable solution reached within the family would likely be preferable to a division imposed upon the parties by this Court.

ENTERED this ____5____ day of July, 1989.

_____
ALEXANDRO C. CASTRO
Associate Judge